The People of the State of Illinois ex rel. Marie Calnan, for and on behalf of Kathleen Calnan, Petitioner and Plaintiff in error, v. Charles H. Weightman et al., Respondents and Defendants in Error.

## Gen. No. 31,137.

1. HABEAS CORPUS—*baptism of child as not affecting determination of custody.* Whether or not a child's baptism into a certain religious faith was contrary to the court's order pending a habeas corpus proceeding for custody of the child was no factor in determining who should have the custody.

2. APPEAL AND ERROR—*considering matters outside the record.* The court may advert to and quote from the trial judge's opinion delivered in deciding the case, as set forth in the respondent's brief, no issue being joined thereon nor the respondent questioning its accuracy, although it is no part of the record nor made so by the bill of exceptions.

3. PARENT AND CHILD—*what showing negatives child abandonment.* On habeas corpus for the custody of a child, a mother was held to have shown that she did not abandon her child by evidence that she sent small sums of money almost weekly for the child's support, sent necessary articles for the child, wrote cards to her, and visited her when in the State, and had refused to grant the child's custody to anyone.

4. HABEAS CORPUS—*motive imputable to mother marrying father of child during the proceeding.* The fact that the mother of an illegitimate child marries the father during habeas corpus proceedings by her to recover the child from those who are caring for it, held only to be attributed to her desire to remove the stigma of illegitimacy from the child.

5. PARENT AND CHILD—*limits to parent's right of custody.* A parent has a right to his child as against the world unless he has forfeited his right, or the welfare of the child demands that he be deprived of it.

6. PARENT AND CHILD—*how child's welfare determined.* In deciding who shall have the custody of a child, the happiness of the child is always the first consideration, but it must be determined within reason as appears from the facts in evidence.

7. PARENT AND CHILD—*choosing child's custodian between persons equally competent.* In case the parents of a child and those who had it in charge for over ten years are equally proper persons to have the custody and supervise the rearing of the child, the parents should have the preference.

8. APPEAL AND ERROR—*review of habeas corpus order as confined to record.* The review of a final order in habeas corpus is confined to matters disclosed in the record although the order awarded a child's custody more than three years prior to the review.

9. APPEAL AND ERROR—*what showing justifies change in child's custody.* A remanding order should be changed to direct that a child, originally remanded to her parents' custody, be remanded to the charge of those given her custody by the trial court under habeas corpus, on affidavits showing that the parents of the child have not communicated with her for three and a half years nor lived with each other since their marriage during the trial and have removed to different States.

10. APPEAL AND ERROR—*directions to court on remanding habeas corpus order.* On remanding a child to the custody of those with whom the court originally placed her, on affidavits showing her parents had moved to other states and did not write to her, the court was directed to determine the matter of final custody at once, con-

sidering the fitness of her then custodians and the wishes of the child so far as not contrary to her parents' legal rights, but not making any order to have her sent out of the state.

Error by plaintiff to the Superior Court of Cook county; the Hon. HUGO PAM, Judge, presiding. Heard in the third division of this court for the first district at the May term, 1927. Reversed and remanded with directions. Opinion filed October 26, 1927. Rehearing denied and opinion modified November, 12, 1927.

RYAN, CONDON & LIVINGSTON, for plaintiff in error; DAVID J. GREENBERG and JOHN M. TUOHY, of counsel.

DIMMITT C. HUTCHINS, for defendants in error.

MR. JUSTICE HOLDOM delivered the opinion of the court.

This is a writ of habeas corpus which Marie Calnan (now Malloy) brought to get possession of her child, Kathleen Calnan from the respondents, Charles H. Weightman and Gertrude A. Weightman, with whom she had been living for several years.

It appears that Kathleen was born on or about February 28, 1912; that at the time of the birth of Kathleen her putative father was one Patrick H. Malloy; that Malloy subsequently joined petitioner in the writ and prayer for the custody of Kathleen; that he represented in his petition that he and Mary Calnan contracted a common-law marriage on or about May 20th, 1911, at Lemon, in the State of South Dakota, but that common-law marriages were not legal in that State. During the hearing of the case in the trial court, he and petitioner were married by a priest of the Roman Catholic Church and became husband and wife.

It is uncontradicted that the petitioner appealed to one of the respondents, The Illinois Children's Home and Aid Society, for assistance in securing a place in which to board Kathleen, and that subsequently the child was placed with the respondents, Charles Weight-

People ex rel. Calnan v. Weightman, 246 Ill. App. 394.

man and Gertrude A. Weightman, who have had charge of her since June, 1912, except for short periods of time when she was in the custody of petitioner and her husband, Patrick H. Malloy, and one Mrs. Hurd and one Mrs. McGrath.

While the record is voluminous, in the view we take of the probative force of the evidence, there is but little dispute in the relevant testimony regarding the crucial and controlling facts in the case.

We find from the evidence that there never was a voluntary surrender of the custody of Kathleen to the Weightmans, or an abandonment of her by her mother, but that during all of the time she was in their custody and lived with them board was paid for her by petitioner, ranging from $1.50 to $3 a week; that whenever the question presented itself as to the surrender of Kathleen to the Weightmans, or her adoption, petitioner consistently and persistently refused to consent to part permanently with Kathleen, or consent to her adoption; that while Kathleen's board money was at times paid irregularly, still there was always a subsisting verbal contract for the payment of board by petitioner for her maintenance to the Weightmans.

It appears from the testimony that the Weightmans are by religious profession Presbyterians, and that the Malloys are adherents of the Roman Catholic faith. It likewise appears that Kathleen has been sent to the Presbyterian Church and Sunday school and instructed in the tenets and belief of that denomination, and that during the pendency of this suit and before the final order in the trial court Kathleen was baptized, and respondents argue that such baptism was in deliberate defiance of the orders of the court. With the latter statements we are unable to concur. The court had no jurisdiction to interfere with the religious training of Kathleen, and whether she was baptized or not was no concern of the trial judge or a factor in

dispute in the case before him, calling for any solution or direction on the court's part.

At the time of the birth of Kathleen petitioner was about thirty-three years of age and dependent for her support and that of Kathleen upon her earnings; that she was a teacher in the public schools at Lemon, South Dakota, and later she secured employment in the Treasury Department of the Federal Government at Washington; that during these times she was necessarily absent from Chicago; her absence accounts for the fact that she seldom visited Kathleen, but it is a fact that while her payments for Kathleen's support were irregular, still the major portion due to the Weightmans was paid. It is in evidence that petitioner did not write often to Kathleen, but did send her some postal cards, and when she came to Chicago visited Kathleen. Contrary to petitioner's express desire that Kathleen should be brought up in the Catholic faith (the faith of her parents), and in violation of such request, the Weightmans procured her to be instructed in the religion of the Presbyterian Church, and it is not disputed but that the officers of the Children's Home and Aid Society reported to petitioner that Kathleen was being brought up in the Catholic faith. The fact that she was being reared a Presbyterian was concealed from Kathleen's mother.

Respondents in their brief set forth the opinion delivered by the trial judge in his decision of the case. While this is not a part of the record or made so by the bill of exceptions, yet as no issue has been joined upon it and respondents do not challenge its accuracy, we will advert thereto and quote upon the court's observation as thus reported.

The hearing of the case was commenced October 25, 1923, and from that time on until March 15, 1924, testimony was taken, and on April 5, 1924, the final order was entered and appears in the abstract in the following words: "An order that the decision of the court be confirmed and the petitions of the relatrix and the

relator are dismissed and the child, Kathleen Calnan Malloy, be remanded to the custody of the respondents, Charles P. Weightman and Gertrude A. Weightman. Further ordered that the cost of this proceeding be taxed against the relatrix and the relator, and that respondents have judgment therefor as in abstract, and that any of the parties to this cause have six months in which to present a bill of exceptions.''

The trial judge found that for a period of nine years ''Miss Calnan paid from $1.50 to $3.00 a week—a majority of the time, however, $3.00 a week—for the support of the child; also provided clothing and other necessities. The child continued all this time with Mr. and Mrs. Weightman. The testimony shows that at times the payments for board were slow, but the payments, however, were made up.''

And the trial judge comments in his opinion that ''in all this period Miss Calnan visited the child three or four times, but, of course, she lived at all times a considerable distance from Chicago, at least one thousand miles away.'' We think this fully explains the reasons why the mother did not visit Kathleen more often.

The trial judge continued further in his opinion, *supra:* ''About 1919 to 1921 Miss Calnan, in her letters to the Society, inquired about Kathleen being brought up in the Catholic faith, and the Society communicated that request to the Weightmans. The Weightmans, however, did not observe her request and the little girl was brought up in the Presbyterian faith. She went regularly to Sunday school and received the religious instructions of the Presbyterian Church. The Society, however, reported to Miss Calnan that the little girl was being brought up in the Catholic faith. There is no question but that somewhere there was an intention to conceal from Miss Calnan the fact that her wish, that Kathleen be brought up in the Catholic faith, was not being followed. It serves no purpose here to endeavor to place the responsibility

for this situation, the essential fact being that the little girl was not being brought up in the faith of her mother.''

It further appears in the aforesaid opinion that papers were drawn for the adoption of Kathleen, but that her mother refused to sign such papers. Whatever her reason was for such refusal is immaterial. The fact remains that she did not sign and did not consent to the desires of the Weightmans to adopt Kathleen.

While the trial court commented upon the fact that Kathleen had been abandoned by her mother, such statement is neither supported by any evidence of probative force, nor by any recital of evidence by the judge in his opinion; and the judge in his opinion states that while financial circumstances prevented Kathleen's mother from at times sending to the Weightmans the support money agreed upon, still that the mother insisted that she had never abandoned Kathleen and that she was entitled to her custody.

The trial court comments upon the fact that petitioner for eleven years persistently refused to marry Malloy, and that she placed her refusal upon the fact that his financial condition was not prosperous, but that subsequently it did improve, and that Malloy and petitioner were married as cited above. However, the judge rather ascribed that action of petitioner to an ulterior motive, but whatever the opinion of the judge may be upon that subject, the fact remains under the law that by marrying the putative father of her child she by that act removed the stigma of illegitimacy from Kathleen, and we know no reason why Mrs. Malloy, as she now is, is not entitled to be credited with being moved legally to marry the putative father of Kathleen in the interest of Kathleen's legitimacy, for if she was loath to marry Malloy, the fact that she did finally marry him can only be attributed to the desire on her part to remove the stigma of illegitimacy from Kathleen. Whatever in fact may have ultimately

moved Kathleen's mother to marry Malloy, the legal effect of that marriage was to legitimatize Kathleen, and it was the most natural thing for her mother to do in Kathleen's interest.

The Weightmans and the Malloys are all good people, of excellent character and reputation, and are each competent to have the custody and nurture of Kathleen. In a financial way the Malloys *per capita* of their family are better off financially; and while the two daughters of the Weightmans were contributing their earnings to the family exchequer, there is no certainty that such contributions would continue, because they might marry or cease to work.

By agreement of counsel, the trial judge states in his opinion, Kathleen was questioned by the judge, and the judge said in the foregoing opinion, "The child answered that she did not care to express a preference as to with whom she would like to go; that she would be happy to be with the Weightmans; that she would be happy to be with her father and mother; indeed, that she left it entirely to the court to say with whom she should go; and she would accommodate herself to the decision of the court; that she would pray to God that the court might be guided by Him to make a proper decision."

Following this the trial judge said that "about ten days ago the court was informed by Mrs. Hurd that the child wanted to see him. The child had been informed that the court was nearly ready to give a decision. Accordingly, the child came down to the court and stated to the court that for the last few days she was low spirited and depressed; that when she thought at night as to where she would go, she realized she wanted only one place and that was the Weightmans."

This latter statement seems to have influenced the judge in the final determination to which he came. The statement quoted is cogent evidence that some one had worried Kathleen a good deal, and from her own statement she was not then in a mental condition to

pass upon the question of her preference. The earlier statement quoted by the judge seems to us to be a more exact statement of the normal condition of Kathleen's mind on the subject. It is, of course, and it could hardly be otherwise among nice people, that Kathleen formed an affectionate attachment for the Weightmans, and that they were devoted to Kathleen and her best interests. Kathleen stated that she loved her father, and while she is not so affectionate towards her mother, there is no good reason shown in this record why Kathleen should not return to her mother.

The trial court further said, in which statement we concur, "Under the authorities, there is no question that the natural father and mother ordinarily have the right to their child; however, in every case cited, wherein this principle is set forth, there is the reservation that the best interests of the child must always be considered." And the judge quotes from *Hohenadel v. Steele*, 237 Ill. 229, that "A parent has a right to the custody of his child as against the world unless he has forfeited his right or the welfare of the child demands that he be deprived of it," citing *Wohlford v. Burckhardt*, 141 Ill. App. 321, which was a writ of habeas corpus by the father, whose claim to the custody of the child was sustained.

It is quite true that the happiness of the child is the first consideration, but that happiness must be considered within reason, as appears from the facts in evidence. There is no doubt but that Kathleen would be happy with the Weightmans or with her parents, and that she would be properly cared for by either one to whom her custody might be given; but, as in this case, where both contestants are equally proper persons to have the custody and supervise the bringing up of the child, the parents should be awarded the preference.

It is apparent from the trial judge's own statement that Kathleen's parents will give her all the attention

and the love and affection that she could possibly expect, for the trial judge said "I have no question but that both Mr. and Mrs. Malloy would like to, and would endeavor to create a real home for Kathleen, characterized by love and devotion for her welfare, but there is in the mind of the court a great uncertainty whether Kathleen can or will find there that happiness and contentment necessary and essential for her future well-being."

In view of the language of the trial judge in the fore part of the last quotation, we do not think there is any foundation for his "great uncertainty."

While it is more than three years since the entry of the final order in the trial court, our review is confined to the record as thus disclosed, and we can take no judicial cognizance of anything that happened during those past three years, except as we may find them in the record, and we find nothing in the record in relation thereto.  However, we have diligently examined all that counsel have to say, and therefrom we do not find anything to justify depriving the Malloys of their legal right, or to destroy the right of Kathleen to reside with and be brought up by her parents.

We find naught in this record which would justify this court's conclusion that in any way the parents of Kathleen either at any time abandoned her or did any act, which under the law would render them incompetent or undesirable to have the custody of their daughter Kathleen.

It is therefore ordered that the judgment of the superior court be reversed with directions to that court to enter an order giving the custody of Kathleen to her parents, Patrick R. and Marie Calnan Malloy.

*Reversed and remanded with directions.*

Taylor, P. J., and Wilson, J., concur.

Since handing down the foregoing opinion the respondents have filed a petition for rehearing.

What respondents really expect is not a rehearing but a modification of the remanding part of the order.

With the petition has been filed affidavits that there has been a change in the situation of the parties, which makes it impracticable, and not in the interest of the minor Kathleen, to be given into the custody of her parents. Among the changed conditions is the alleged fact that the father and mother of Kathleen have not resided in the marital relation since the decision of the case in the trial court; that the father, Patrick R. Malloy, lives on a farm in Miles City, Montana, and that the mother resides on a farm in Wisconsin, and keeps house for her brothers; that Kathleen has not heard from her parents during the last three and one-half years; that to send her to her parents would remove her from the State of Illinois and out of the jurisdiction of its courts.

The remanding order is therefore changed and the said Kathleen Malloy is remanded to the custody of the respondents until the final order in the trial court, after the determination by the court of these questions, also, that whether under the changed conditions of the Malloys, the parents of Kathleen, the proper persons to have the custody of Kathleen are the respondents, having in mind the proper conservation of the right of Kathleen to reside in the state of Illinois, of which she is a native, and within the jurisdiction of the court of which she is at the present time a ward; that on the hearing to be had effect shall be given to the wishes and desires of Kathleen where they do not conflict with any principle of law or with the rights of her parents to her custody, but that no order shall be made by which Kathleen shall be sent out of the state of Illinois; and the inquiry is likewise extended to the present condition and environment of the respondents to determine whether they are still proper persons to have the custody of Kathleen; that the trial court pro-

ceed with all due dispatch in determining the questions aforesaid, and to arrive at its decision promptly and without delay.

This is an addenda to the foregoing decision and shall be construed and read as a part of it.

The petition for rehearing is denied.